IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALLSTATE PROPERTY               :        CIVIL ACTION
CASUALTY INSURANCE COMPANY,    :
       Plaintiff,                :
                                   :
     v.                          :
                                   :
ANGELA VARGAS,                  :        NO.  2:06-CV-3368-LDD
       Defendant.              :

<u>MEMORANDUM</u>

And now, this 29th day of August 2008, upon consideration of Plaintiff Allstate Property

& Casualty Insurance Company's ("Allstate") Motion for Summary Judgment (Doc. No. 89),

Defendant Angela Vargas' Answer to Allstate's Motion for Summary Judgment (Doc. No. 95),

Allstate's Reply Brief in Support of its Motion for Summary Judgment (Doc. No. 102)[1], it is

hereby ORDERED that Motion for Summary Judgment (Doc. No. 89) is GRANTED.

I.  Factual and Procedural Background

The present action, which began as a straightforward matter, has acquired a convoluted

factual and procedural history.

On June 19, 2003, Defendant Angela Vargas ("Vargas") was injured when the vehicle she

was trying to park was side-swiped by a cab owned by the Ali & Amir Cab Company ("Cab

Company").  As a result, Vargas sustained injuries to her back, neck and right shoulder.

At that time, Vargas was insured under an Allstate automobile insurance policy (Policy

---

[1]Additionally, this Court considered Allstate's Motion to Preclude Expert Testimony by Barbara Scotti (Doc. No. 92), Defendant's Answer to Motion to Preclude Expert Testimony by Barbara Scotti (Doc. No. 96), Allstate's Motion to Preclude Expert Testimony by Daniel J. Siegel, Esquire (Doc. No. 91) and Angela Vargas' Answer to Motion to Preclude Expert Testimony by Daniel J. Siegel, Esquire (Doc. No. 97) to the extent necessary to resolve Allstate's Motion for Summary Judgment.

Number 00777344901/13) (the "Policy") issued to Stacey Wilkins ("Wilkins"). Vargas had been

added to the Policy on March 1, 2000 and was identified on the Policy as Wilkins' spouse.

Under the Policy, Wilkins was the sole named insured and coverage was provided for two

vehicles, one of which Vargas was operating on the date of the accident. The Policy provided,

among other things, for rental reimbursement coverage, collision coverage and underinsured

motorist coverage ("UIM") in the amount of $100,000 per person/$300,000 per accident, with

stacking for two vehicles.

On the day of the accident, Vargas notified Allstate of the collision. In the recorded

statement secured by Allstate, Vargas stated that she was Wilkins' fiancee. On July 2, 2003,

Thomas More Holland, Esquire, ("Holland") advised Allstate that he represented Vargas and

requested the declarations sheet for the Policy and any relevant waivers. Holland did not present

a UIM claim at this time.

In the weeks following the accident, Allstate had several conversations with Wilkins and

Vargas related to Allstate's rental reimbursement coverage.[2] During this time, Allstate also

initiated subrogation proceedings against the Cab Company's insurer for damage to the vehicle

Vargas was operating. On August 7, 2003, after the damage to the vehicle was repaired, Allstate

issued Vargas a check for $2,828.23 pursuant to the Policy's collision coverage.

On September 3, 2004, Holland again requested the declaration sheets. Allstate provided

the documents on October 6, 2004.

On March 18, 2005, Holland requested the declaration sheets once again, advising that he

---

[2] These discussions occurred because of Vargas' failure to return the rental car within the 30 days as provided by the Policy.

had misplaced the initial documents.  In this letter, Holland notified Allstate that Vargas had filed

a third-party lawsuit against the Cab Company and that Vargas intended to seek UIM coverage

under the Policy since the Cab Company only had $15,000 of insurance and Vargas continued to

incur medical expenses and wage loss.  Holland also requested that Vargas' claim for UIM

coverage be sent to arbitration without delay.  This was the first notice of a potential UIM claim.

On May 19, 2005, Holland wrote again requesting the declarations sheet.  In this letter,

Holland indicated that Vargas' worker's compensation lien was ongoing and already exceeded

$90,000.[3]  Holland also requested Allstate's agreement to stay the cause of action against the Cab

Company based on the UIM savings clause.

On May 20, 2005, the initial claims adjuster, Kelley Cotter, transferred the claim to

Lester Waxler ("Waxler"), an adjuster with 12 years experience in handling UIM claims.  On

May 24, 2005, Waxler informed Holland of his assignment to handle the UIM claim.   In this

letter, Waxler also advised Holland that Allstate had twice provided the declarations sheet and

provided his conclusion that $200,000 of UIM coverage was available.[4]  Waxler also agreed with

Holland's suggestion to stay Vargas' claim against the Cab Company.  Finally, Waxler advised

that because Vargas had requested arbitration, Allstate had retained counsel, Daniel Divis

("Divis"), to assist in the matter, but if Holland still wanted to resolve the UIM claim without

---

[3]  As a result of the accident, Vargas received worker's compensation benefits because she was sufficiently
injured to be unable to continue in her prior job as a housekeeper.

[4]  This amount was based, in part, on Waxler's review of the representation in the Policy that Vargas was
Wilkins' spouse.  Pursuant to the terms of the Policy, as the spouse of the named insured, Vargas was entitled to
stacked coverage of $200,000, as opposed to $100,000 of unstacked coverage if she was not his spouse.  Though the
file forwarded to Waxler contained a tape recording of the statement made by Vargas in which she stated that she
was the fiancee and not spouse of Wilkins, Waxler neither listened to nor transcribed the tape before determining
that Vargas was entitled to stacked coverage.

litigation, he should submit Vargas' complete medical records for an assessment of settlement value.

From June 2005 through May 2006, Allstate prepared for the June 13, 2006 arbitration proceeding. Allstate secured all of Vargas' medical records from several treating physicians, the legal files from counsel in related actions, conducted depositions, obtained Vargas' MRI films, conducted an independent medical examination of Vargas and secured expert reports. Extensive delays were associated with securing the compete medical record.

Around May 24, 2006, once all the relevant documentation had been received, Waxler submitted the matter to an Allstate evaluation consultant for a determination of settlement authority. Waxler recommended to Marla Edwards ("Edwards"), the evaluation consultant, that Allstate commence negotiations with an offer of $160,000.

On May 26, 2006, Edwards reviewed Waxler's recommendation. She identified a conflict between the Policy, which identified Vargas as Wilkins' spouse, and the tape recorded post-accident statement, which identified her as his fiancee. Because this conflict raised an issue as to whether Vargas was entitled to stacked benefits, Edwards returned the matter to Waxler with an instruction to resolve the issue of Vargas' marital status before seeking settlement authority. On May 30, 2006, Waxler determined that Vargas and Wilkins were not married at the time of the June 19, 2003 accident[5] and informed Holland of this determination. As a result, Waxler further advised Holland, Vargas was not entitled to stacked coverage. Accordingly,

---

[5] Holland was aware that Vargas was not married to Wilkins since at least March 18, 2005. Specifically, in a letter dated March 18, 2005 and written to employer's counsel in the worker's compensation action, Holland stated that "Stacey Wilkins is the boyfriend of Ms. Vargas and they have resided together since the date of the injury." (Pl.'s Mot. for Summary Judgment, Ex. 31). Despite this knowledge, Holland did not advise Allstate of their mistake as to Vargas' marital status.

coverage was limited to $100,000.

In his June 7, 2006 letter to Divis, Holland disputed this determination and set forth two theories under which Vargas was entitled to stacked coverage.[6]   On or about June 7, 2006, and prior to any settlement demand by Holland, Allstate made a tender offer to Vargas of $100,000–the unstacked UIM policy limit.  Prior to June 2006, Holland had not made any settlement demand upon Allstate.

Also on June 7, 2006, Allstate's counsel sought to postpone the arbitration hearing while the parties attempted to resolve the dispute as to stacking.  The arbitration was rescheduled for August 9, 2006.

On July 31, 2006, Allstate filed a declaratory judgment in this Court seeking a determination of whether Vargas was a "resident spouse" under the Policy so as to entitle her to stacking benefits.

In early August 2006, having failed to resolve the stacking dispute, Divis moved to stay the arbitration proceeding pending resolution of the declaratory judgment action before this Court.   Although Holland did not consent, the arbitration proceeding was stayed.

On August 18, 2006, after discussions between Holland, Waxler and Divis about the legal consequence of Vargas' acceptance of the $100,000 on her claims for coverage in excess of $100,000, the undisputed portion of Vargas' UIM claim was accepted by Holland.

Holland filed a third party complaint against Wilkins in the declaratory judgment action on August 30, 2006.  (Doc, No. 6)  This Court dismissed Wilkins from this matter on December

---

[6]  The first theory asserted a common law marriage between Vargas and Wilkins.  This claim was advanced even though Holland had previously stated that Vargas was Wilkins' fiancee.  Under Holland's second theory, since Vargas was the co-owner of the other vehicle covered by the Policy, she was entitled to stacking.

28, 2006 (Doc. No. 33) since Vargas failed to present a cognizable theory of derivative liability.

Vargas' motion to join Wilkins as an additional defendant (Doc. No. 36) was denied on March 8,

2007 since Wilkins was not a necessary or indispensable party to the declaratory judgment

action.  (Doc. No. 43)

Vargas' Second Amended Answer to the Complaint, filed on January 12, 2007 (Doc. No.

35), also asserted counterclaims against Allstate.  In this answer, Vargas asserted for the 4th time

before this Court[7], the existence of a valid common law marriage with Wilkins.  The Court

ultimately stayed the counterclaims pending resolution of the declaratory judgment action.  (Doc.

No. 33)

Vargas' Third Amended Answer, filed on June 20, 2007 (Doc. No. 60), asserted

counterclaims for breach of contract, bad faith and fraud/misrepresentation.[8]  Following the

completion of discovery, Allstate presented its motion for summary judgment.  (Doc. No. 61)

Finding that Vargas was not a Class I insured and therefore was not entitled to stacked benefits,

this Court granted plaintiff's motion on August 27, 2008.  (Doc. No. 65)  This Court also

concluded that Allstate's payment of $100,000 in unstacked UIM benefits fully satisfied its

---

[7]  The first averment of Vargas' common law marriage to Wilkins appears in Vargas' Third-Party Complaint filed on August 28, 2006, which states that "[i]t is believed and averred further that Defendant Angela Vargas, third-party Plaintiff, and third-party Defendant Stacey Wilkins were at this time of the initiation of the contract at issue common law husband and wife."  (Doc. No. 5 ¶ 4).  Similarly, Vargas asserted in various other submissions before January 12, 2007  that she "was at all times material the common law spouse of third party Defendant Wilkins." (Doc. No. 10 ¶ 8; Doc. No. 11 ¶ 8; Doc. No. 23 ¶ 8).  After the filing of the Second Amended Answer, Vargas reiterated this averment.  (Doc. No. 32 pg. 7, Doc. No. 36 pg. 3; Doc. No. 50 ¶ 4).

This Court has immense difficulty understanding how Holland can satisfy the requirement of good faith imposed on all documents filed with the Court.  At a minimum, Holland had previously described Vargas and Wilkins as unmarried; at worst, Holland had actual knowledge that Vargas was legally incapable of marriage to Wilkins since she was married to another.  Because of the seriousness of this issue, by separate Order this Court directs Holland to show cause why he should not be subject to the provisions of Fed. R. Civ. P. 11.

[8]  In this answer, Vargas abandoned her claim of common law marriage.  While Holland did not provide a contemporaneous rationale to the Court, at his deposition Holland explained that Vargas was married to another man at the time of the accident.  (Thomas More Holland Dep. 170:22 - 172:2; 238:4 -239:19 Feb. 21, 2008).

contractual obligations under the Policy.

Thereafter, Allstate moved to dismiss the remaining counterclaims.  Although Vargas had previously advised the Court that, "[i]f [Allstate] were to prevail on the declaratory judgment action, Vargas' counterclaims would be mooted." (Pl.'s Statement of Material Fact ¶ 205). Vargas opposed Allstate's motion to dismiss and asserted new rationales in support of the bad faith claims.

On November 16, 2007, all of Vargas' counterclaims, with the exception of the bad faith counterclaim, were dismissed.[9]

II.  Discussion

### A.  Standard of Review for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In ruling on the motion, the Court must draw all reasonable inferences in the light most favorable to the non-moving party, and "may not weigh the evidence or make credibility determinations."  Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255.  While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the non-movant's burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).

---

[9]  The facts related to Allstate's alleged bad faith in delaying its consent to the settlement of Vargas' claims against the Cab Company are set forth in detail in the Court's discussion of this claim.

Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989).

*B. Legal Standard for Bad Faith Claims*

The sole issue presented in the present motion is whether, as a matter of law, Allstate's actions with respect to Vargas' claim for UIM coverage support a finding of bad faith. As Holland first presented the UIM claim on March 18, 2005, our analysis necessarily focuses on events after that date.

Under Pennsylvania law, to recover on a claim of bad faith the insured must show "that the defendant did not have a reasonable basis for denying benefits under the policy and the defendants knew or recklessly disregarded its lack of reasonable basis in denying the claim." Turletsky v. Prudential Property & Casualty Company, 649 A.2d 680, 688 (Pa. Super. Ct 1994). Turletsky further instructs in the insurance context "bad faith" has a particular meaning. Specifically

> "[b]ad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty ( i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Id. (quoting Black's Law Dictionary 139 (6th ed. 1990)). Additionally, "bad faith must be proven by clear and convincing evidence and not merely insinuated." Id. This heighten standard requires a showing that the evidence in the record "is so clear, direct, weighty and convincing as

8

to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith."  Bostick v. ITT Hartford Group, Inc., 56 F. Supp. 2d 580, 588 (E.D. Pa. 1999).

Moreover,

"[]mere negligence or bad judgment is not bad faith.  To support a finding of bad faith, the insurer's conduct must be such as to 'import a dishonest purpose.'  In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill-will."

Condio v. Erie Insurance Exchange, 899 A.2d 1136, 1143 (Pa. Super 2006).  "Accordingly, the plaintiff's burden in opposing a summary judgment motion is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial."  Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999); see also Bostick, 56 F. Supp. 2d at 588. ("In a bad faith case, summary judgment is appropriate when there is no clear and convincing evidence that the insurer's conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim.").

C.  *Admissibility of Proffered Expert Reports and Opinions*

To support her claims of bad faith and oppose Plaintiff's motion for summary judgment, Defendant has relied largely on the expert opinions supplied by Daniel J. Siegel, Esquire ("Siegel") and Barbara Sciotti ("Sciotti").

In resolving a motion for summary judgment, a court may only consider admissible evidence.  Arnold Pontiac-GMC, Inc. v. Budd Baer, Inc., 826 F.2d 1335, 1339 n.3 (3d Cir. 1987) ("Summary judgment, of course, looks only to admissible evidence."); see also Philbin v. Trans Union Corp., 101 F.3d 957, 961 n.1 (3d Cir. 1996) (noting that a hearsay statement that is not capable of being admissible at trial should not be considered on a summary judgment motion).  In determining the admissibility of expert testimony, the Court is guided by Federal Rule of

Evidence 702 which provides

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In applying this rule, a court is required to perform a "gatekeeper" function and exclude unreliable or unhelpful expert testimony.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

　　　　1. Expert Report and Opinions of Daniel J. Seigel

Seigel has been tendered as an expert[10] on the "manner in which Allstate's conduct delayed resolution of this matter, caused Angela Vargas to incur significant additional expenses and [ ] how cases such as this are handled by law firms."  (Def.'s Ans. To Allstate's Mot. to Preclude Expert Testimony of Daniel J. Seigel 3-4).  In his written opinion, Seigel concluded that "Allstate's conduct has created unnecessary delays and, ultimately, has reduced the amount that Angela Vargas should have received in her underinsured motorist case." [11]

Seigel's report consists of a series of inadmissible legal opinions about Pennsylvania insurance law.  "As a general rule an expert's testimony on issues of law is inadmissible." Whitmill v. City of Phila., 29 F. Supp. 2d 241, 246 (E.D. Pa. 1998); see also Gallatin Fuels, Inc. v. Westchester Fire Ins. Co., 410 F. Supp. 2d 417, 421 (E.D. Pa. 1998); Connolly v. Relastar Life

---

[10]  Siegel has worn a multitude of hats in this action.  Initially, he represented Wilkins when Vargas filed a third-party complaint against Wilkins and for the motion to join Wilkins as a necessary and indispensable party.  And finally, once Wilkins was conclusively dismissed from this action, Siegel ghost-wrote brief for Vargas.  (Daniel J. Siegel Dep. 129:22 - 131:13, May 6, 2008).  He now seeks to appear as a putative expert witness.

[11]As Vargas received the policy limit on the underinsured motorist claim, Siegel's conclusion is difficult to understand.

Ins. Co., 2006 WL 3355184, at *13 n.32 (E.D. Pa. Nov. 13, 2006).

Moreover, even assuming the admissibility of these opinions, they neither create a genuine issue of fact nor provide clear and convincing evidence of bad faith.  For example, Seigel fails to support his conclusion that "Allstate's conduct has created unnecessary delay" with sufficient reference to the facts of record.   See Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1198-99 (3d Cir. 1995) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

Indeed, Seigel fails to consider any of the unique facts and circumstances relevant to Allstate's conduct as to Vargas' UIM claims.   See Kosierowski v. Allstate Ins. Co., 51 F. Supp. 2d 583, 596 (E.D. Pa. 1999) (an expert report does not raise a genuine dispute of material fact where the report did not consider the context of the case).  Specifically, Seigel's opinion does not address the effect of Allstate's initial mistaken belief as to Vargas' marital status and the conflicting statements provided by Vargas as to her marital status.  Nor does the report consider Holland's demand for arbitration and the concomitant preparation necessitated by that demand. Finally, the report fails to consider Holland's delays in providing Vargas' complete treatment records.[12]

---

[12]   On June 20, 2005, Holland wrote to Waxler and indicated he was enclosing copies of all medical documentation related to Vargas that were in his files.  The documentation, however, was not complete.  In a letter dated September 6, 2005, Holland supplemented this production with a 2004 report prepared by Dr. Glick and his deposition testimony.  On January 19, 2006, after reviewing the materials provided by Holland, Divis requested additional medical records that had not been provided.  Specifically, Dr. Glick's treatment records, records from North Philadelphia Rehabilitation Center, records from Dr. Heddington, records from Dr. Tabuena and records from Nova Care Physical Therapy.

On January 25, 2006, Divis wrote to Holland requesting that Vargas execute various medical and employment authorizations and releases.  These executed authorizations and releases were ultimately sent to Divis on March 1, 2006, even though all the authorizations and releases had been signed and dated by Vargas on February 2, 2008.

In conclusion, Siegel's report fails to create a genuine issue of material fact.

2. Expert Report of Barbara Sciotti

Defendant also proffers Barbara Sciotti as an expert on the issue of bad faith. Specifically, Sciotti concludes that Allstate acted in bad faith because it failed to reasonably address the issue of available coverage, failed to timely investigate and evaluate the UIM claim, failed to reasonably, timely or fairly settle this claim and was biased against Vargas.

While it is acceptable for Scotti to testify as to industry practices or standards, she is incompetent to tender legal conclusions as to whether Allstate's conduct constitute bad faith. Bad faith, in the context of an insurance claim, has a precise legal meaning which derives from careful interpretation by the state and federal judiciary. See Terletsky, 649 A.2d at 688. ("In the insurance context, the term bad faith has acquired a particular meaning.")  Scotti may not testify as to the ultimate legal issue in this matter: whether defendant has presented clear and convincing proof to support a fact-finder's conclusion that Allstate's conduct constitutes bad faith.  See Kubrick v. Allstate Ins. Co., 2004 WL 45489, at *16 (E.D. Pa. Jan. 7, 2004).  Accordingly, Sciotti's opinion, which usurps the role of the fact finder, could not be submitted to a jury.  See id.; Dattilo v. State Farm Ins. Co., 1997 WL 644076, at *5 (E.D. Pa. Oct. 17, 1997) ("Bad faith is a legal concept of general application which does not require that scientific, technical or specialized knowledge be presented to assist the trier of fact.").

---

On January 26, 2006, Holland responded to Divis' January 19th letter indicating that Holland had requested Dr. Glick, Dr. Heddington, Dr. Tabuena and Nova Care Physical Therapy to provide the requested records.

On March 2, 2006, starting with the medical records of Dr. Tabuena, Holland began forwarding to Divis Vargas' missing medical records.  The March 2nd records were followed by the records from North Philadelphia Rehabilitation Center on March 29, 2006; the records from Vargas' July 20, 2005 automobile accident on March 29, 2006 and the records from the JE Wood Clinic on April 11, 2006.  Though the arbitration was scheduled for June 13, 2006, Holland was still providing medical records on May 27, 2006 (a report from Dr. Glick) and on August 1, 2006 (a July 19, 2006 radiologist report).

As a further matter, the incorrect statements of law in the report raise serious questions about Sciotti's methodology and the reliability of her conclusions.  For example, Sciotti repeatedly identifies a UIM claim as a first party claim which requires an insurance company to take a non-adversarial position toward the claimant.[13]  This characterization of Pennsylvania law is incorrect, for in <u>Condio v. Erie Ins. Exch.</u>, 899 A.2d 1136, 1144 (Pa. Super. Ct. 2006), the Pennsylvania Superior Court rejected the identical opinion also tendered by Ms. Scotti.   The court wrote "[s]imply stated, [UIM claims] are inherently and unavoidably arm's length and adversarial."  Ms. Scotti nevertheless continues to express her opinion that UIM claims are first party claims despite the strong rebuke by the Pennsylvania appellate court; indeed, at her deposition Ms. Scotti, a non-lawyer, strongly implied that the decision of the <u>Condio</u> court, which she had not even fully read, was wrongly decided.  (Barbara Sciotti Dep. 50:14 - 52:10, Apr. 16, 2008).

Moreover, Sciotti's opinion neither creates a genuine issue of fact nor provides clear and convincing evidence of bad faith as the opinion is not well-supported by the factual record in this matter.  <u>See</u> <u>Kubrick</u>, 2004 WL 45489, at * 16 (finding that expert's opinion was not clear and convincing evidence of the insurance company's bad faith because the expert's opinions were not supported by evidence in the record); <u>Kosierowski</u>, 51 F. Supp. 2d at 595 ("The mere presence of an expert opinion supporting the non-moving party's position does not necessarily defeat a summary judgment motion: rather, there must be sufficient facts in the record to validate that

---

[13]   In discussing the relevant standards applicable to bad faith claims, Sciotti asserted

[w]ith respect to a first party claim, such as a UIM claim, the carrier must always be mindful that the claimant is also the insured.  As a first party claimant, the carrier must remain mindful of the heightened status of this claimant and the duties owed.

(Report of Barbara Sciotti 20, Mar. 12, 2008).

opinion."). Indeed, in reaching her conclusions, Scotti fails to consider the factual circumstances surrounding the handling of the Vargas claim, particularly the import of Allstate's error as to the marital status of Vargas and the consequences of the demand for arbitration.

Finally, we are not the first court to reject the opinions of Barbara Scotti because of her failure to consider the factual circumstances of a particular case in arriving at her opinions or her efforts to testify as to legal conclusions. See Kosierowski, 51 F. Supp. 2d at 596; Connolly v. Reliastar Life Ins. Co., 2006 WL 3355184, at *13 n.32 (E.D. Pa. Nov. 13, 2006); Condio v. Erie Ins. Exchange, 899 A.2d 1136, 1144-45 (Pa. Super. Ct. 2006); Miller v. Contnental Cas. Co., 2005 WL 752362, at ** 20-22 (Pa. Com. Pl. Ct. Mar. 23, 2005); Schoffstall v. Nationwide Insurance Company, 58 Pa. D. & C.4th 14, 42 n.7 (Pa. Com. Pl. Ct. 2002).

*D.  Analysis*

Defendant contends that Plaintiff acted in bad faith by (a) failing to make a reasonable investigation of her UIM claim, (b) delaying in investigating her claim, (c) delaying in offering the undisputed unstacked limit on the Policy, (d) delaying in providing consent to settle with the Cab Company, (e) delaying in filing a declaratory judgment and (f) misrepresenting the amount of coverage available under the Policy.

1. Failure to Make Reasonable Investigation

Vargas contends that Allstate failed to make a reasonable investigation of her UIM claim. In asserting this claim, Vargas states she does not challenge Allstate's right to conduct an investigation into her UIM claim. (Def.'s Memo. of Law in Opp'n 11). Nor does Vargas specifically contest the adequacy or reasonableness of Allstate's investigation. Rather, Vargas argues that Allstate acted in bad faith by failing to conduct an investigation of her UIM claim

prior to retaining Divis as counsel.  This argument is frivolous.  As the Pennsyslvania Superior Court stated in Condi, "[b]ecause [the claimant] was required to prove its legal entitlement to UIM coverage, [the insurer] was not obligated to pay the [plaintiff's] claims on demand, no questions asked."  Condio, 899 A.2d at 1145; see also Kubrick, 2004 WL 45489, at *12.

Vargas further contends Allstate did not properly investigate her claim because Waxler did not conduct a contemporaneous analysis or evaluation of medical records upon their receipt. Vargas' claim is belied by the record which demonstrates that Waxler and Divis were reasonably aware of the content of Vargas's medical records during Allstate investigation of her claim.  In particular, Waxler's log identifies specific facts in the medical reports which appear to undercut Vargas' claim for damages.  (Pl.'s Mot. for Summary J. Ex. 6, ALL0020 - ALL0028).

Vargas' argument next transforms into a contention that these entries demonstrate bias on the part of Allstate.   In making this argument, defendant, yet again, fundamentally misinterprets the relationship between Allstate and Vargas once she filed her UIM claim and sought arbitration.  "A UIM claim is not strictly a first party claim and it is inherently and unavoidably adversarial."  Zappile v. Amex Assur. Co., 928 A.2d 251, 255 -257 (Pa. Super. Ct. 2007) (internal quotations omitted); see also Condio v. Erie Ins. Exch., 899 A.2d 1136, 1144 (Pa. Super. Ct. 2006) ("Simply stated, [UIM claims] are inherently and unavoidably arm's length and adversarial.").

Accordingly, Defendant's claim of bad faith under this theory fails.

   2. Delay in Investigating UIM Claim

Defendant also argues that Allstate's delay in investigating her UIM claim supports a finding of  bad faith.  "Delay is a relevant factor in determining whether bad faith has occurred,

but a long period of time between demand and settlement does not, on its own, necessarily constitute bad faith." Kosierowski,  51 F.Supp. 2d at 588-89; Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 572 (E.D. Pa. 2000).  The primary consideration is "the degree to which a defendant insurer knew it had no basis to deny the claimant: if delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred." Kosierowski, 51 F. Supp. 2d at 589.

A careful review of the record in this matter does not yield clear and convincing evidence of bad faith by Allstate in investigating and settling Vargas' UIM claim.  Vargas's accident occurred on June 19, 2003.  On July 2, 2003, Holland advised Allstate that he represented Vargas.  Almost nineteen months later, on March 18, 2005, Holland first notified Allstate of Vargas' desire to implicate UIM coverage.  Two months later, the matter was reassigned to Waxler, who promptly advised Holland of his assignment to the matter and the retention of Divis as counsel for Allstate.

The UIM arbitration hearing was initially scheduled for June 13, 2006.  From May 2005 through June 2006, Allstate secured the medical records, legal files, expert reports and depositions necessary to adequately represent its interests at the deposition.  The record demonstrates that Allstate encountered significant difficulty and delay in developing a complete file.[14]  Given the scope of the investigation this period of time was neither unreasonable nor evidence of bad faith.  Williams v. Hartford Cas. Ins. Co., 83 F. Supp. 2d 567, 573 (E.D. Pa. 2000) (holding that fifteen month delay in processing UIM claim was not bad faith); Quaciari v.

---

[14]  In addition to the delays already discussed above that resulted from the piecemeal production of Vargas' medical records, Allstate also faced significant delays in obtaining Vargas' MRI films from third parties.  The films were ultimately only secured after numerous letters from Divis, a subpoena from the arbiter, and the intervention of Holland.

Allstate Ins. Co., 998 F. Supp. 578, 582-83 (E.D. Pa. 1998) (finding that eleven month delay between notice of UIM claim and arbitration awarded was not bad faith).

The record demonstrates that after June 2005, Allstate diligently investigated Vargas' UIM claim and began to formulate a settlement offer once it had secured the relevant and necessary information.  Under the circumstances of this case, Allstate investigating the UIM claim for twelve months does not, in and of itself, sufficiently establish clear and convincing evidence of bad faith.

Vargas' argument that this matter could have been resolved more quickly is without merit.  Initially, it was Vargas who first requested that the matter be submitted to arbitration.  Furthermore, Vargas did not oppose the June 13, 2006 arbitration date.  Finally, although two months lapsed between the time Allstate was notified of Vargas' UIM claim and when it began its investigation, as a matter of law this brief span of time, standing alone, cannot be construed as establishing bad faith.

### 3. Delay in Offering Undisputed Unstacked Limit of Policy

Vargas also contends that Allstate acted in bad faith by failing to tender, at an earlier date, the undisputed unstacked limit to the Policy.  This contention cannot support a bad faith claim under Pennsylvania law.

In Zappile v. Amex Assurance Co., the Pennsylvania Superior Court held that no duty exists upon an insurance company to make partial payments of insurance claims.  928 A.2d 251, 256 (Pa. Super. Ct. 2007).  Furthermore, the court continued, "[e]ven if we accept the notion that a partial payment is legally required, which we do not, the case law indicates that a prerequisite for such payment is a formal demand for the partial payment.  Without a finding that such a

17

demand was made, the claim is not viable." Id. at 257.

It is undisputed that Vargas did not make a demand prior to June 7, 2006, the date upon which Allstate offered $100,000. Accordingly, as a matter of law, Allstate cannot have acted in bad faith by failing to offer the undisputed unstacked limit. This claim of bad faith is without substance.

### 4. Delay in Providing Consent to Settle

Vargas next contends that Allstate acted in bad faith as a result of its delay in providing consent to settle Vargas' lawsuit against the Cab Company. This claim is specious.

On October 27, 2005, Vargas and the Cab Company reached a settlement wherein the Cab Company's insurance carrier agreed to tender the entire $15,000 limit on the applicable policy. This case was then marked as settled on November 3, 2005 by the Prothonotary of the Philadelphia Court of Common Pleas. Allstate, which had subrogation rights on this claim, had not yet been requested to consent to this settlement.

Holland first requested Allstate's consent to settle on April 28, 2006. On May 2, 2006, Divis advised Waxler of Holland's request and, that same day, Waxler instructed Divis to tell Holland that he would need a declarations sheet from the Cab Company's insurance carrier or an affidavit from the insurance carrier attesting to the level of coverage before Allstate could provide its consent. On May 16, 2006, Holland provided Divis a "Case Management Conference Memorandum" and an affidavit of the owner of the Cab Company in support of the request for consent to settlement, which were rejected as insufficient proof of the terms of insurance coverage for the Cab Company.

Holland faxed the declarations sheet to Divis on June 2, 2006, June 16, 2006 and July 26,

2006, but these faxes either did not reach Divis or were not forwarded to Waxler.  Finally, on August 7, 2006, still having not received the requested documentation, Waxler called Holland. Holland thereafter faxed Waxler the declarations sheets and Waxler granted immediate consent to settle upon receipt of the documentation.  The settlement funds were ultimately distributed on August 13, 2007 and were used primarily to satisfy Holland's professional expenses.   The balance was provided to the worker's compensation insurance carrier.

Clear and convincing evidence of bad faith is not evident in these facts.  First of all, Vargas did not request Allstate's consent to settlement until April 28, 2006, six months after her tentative settlement with the Cab Company.  Soon after receiving this request, Allstate requested supplemental documentation from Holland.  Nearly six weeks lapsed before Holland provided this documentation.   Although it appears that Divis' failure to forward the documentation resulted in a two month delay in the grant of consent to settle, this delay, standing alone, does not provide clear and convincing evidence of bad faith.  At best, it constitutes evidence of negligence.

5. Delay in Filing a Declaratory Judgment

Vargas also claims that Allstate's delay in filing the declaratory judgment action, which sought a declaration that Vargas was a Class II insured and consequently not entitled to stacked UIM coverage, constitutes evidence of bad faith.  On May 30, 2006, Allstate concluded that Vargas was not married to Wilkins at time of the accident.  On that same day, Divis informed Holland by letter that Vargas was not entitled to stacked coverage and the maximum coverage available under the Policy was $100,000.  On June 7, 2006, Holland sent a letter to Divis arguing that Vargas was still entitled to stacked coverage because (a) she had a common law marriage

19

with Wilkins[15] and (b) because she had a co-ownership interest in the other car listed on the Policy.  Because Vargas' claim now involved a coverage dispute, Allstate advised Holland that this issue could not be resolved in an arbitration hearing.  As a result, on July 31, 2006, Allstate filed the instant declaratory judgment.

These facts fall woefully short of clear and convincing evidence of bad faith.  To the extent that Holland might have preferred that a declaratory judgment action be brought sooner, nothing preventing him from filing such an action.

6. Misrepresentation of Coverage Amount

Vargas also contends that Allstate acted in bad faith as a consequence of its inaccurate representations of coverage available under the Policy.  Vargas seeks support for this conclusion in these events:  on May 24, 2005 Allstate advised Vargas that she was entitled to $200,000 in stacked UIM coverage and on May 30, 2006 Allstate concluded the policy provided only $100,000 in unstacked UIM coverage.

Under Pennsylvania law it is well settled that "mere negligence or bad judgment" does not provide a sufficient legal basis for a bad faith claim.  Terletsky, 649 A.2d at 688;  see also Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d Cir. 2005).  To make a claim for bad faith, "[t]he insured must ultimately show that 'the insurer breached its duty of good faith through some motive of self-interest or ill will.'"  Babayan, 430 F.3d at 137 (quoting Brown v. Progressive Ins. Co., 860 A.2d 493, 501 (Pa. Super. Ct. 2004)).

Waxler's original belief that Vargas was entitled to $200,000 in stacked UIM was based

---

[15]  Holland took this position even though in a letter dated March 18, 2005, he represented to employer's counsel on the worker's compensation matter that Vargas and Wilkins were only boyfriend and girlfriend at the time of the accident.

upon his mistaken belief that Vargas was married to Wilkins at the time of the accident, information had been entered into the database by the agent who sold the policy to Wilkins. This information was patently incorrect, however, as Vargas was married to another person at the time.  Had Waxler promptly reviewed the recorded statement that Vargas gave Allstate shortly after her accident, he would have discovered the inconsistent statements as to Vargas' marital status.

Waxler's mistaken belief and failure to discover the conflicting statements concerning Vargas' marital status constitute classic examples of negligence and deficient judgment and Vargas fails to cite to evidence in this record from which this Court could conclude that Allstate's initial misrepresentation of the available coverage was anything other than a mistake. Evidence of ill will or self-interest is lacking.  Indeed, Waxler's negligence inured to the detriment of Allstate for his malfeasance caused Allstate to incur unnecessary expense in preparing for the arbitration proceeding and in prosecuting this declaratory judgment action.

Stripped of its rhetoric, Vargas' argument is an assertion that Allstate should have approved an invalid claim and its failure to do so, and its subsequent discovery of the true facts, demonstrate bad faith against its client.  Vargas, of course, is unable to provide legal support for this extraordinary proposition.  The claim is rejected.

III. Conclusion

For these reasons, it is hereby ORDERED that Motion for Summary Judgment (Doc. No. 89) is GRANTED.  An appropriate order follows.